FILED
CLERK, U.S. DISTRICT COURT

10/14/2020

CENTRAL DISTRICT OF CALIFORNIA
BY: _____CW_____ DEPUTY

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

### SOUTHERN DIVISION

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | Case No.: SACR 17-00076-CJC |
| Plaintiff, | **ORDER DISMISSING WITH PREJUDICE CHARGES AGAINST DEFENDANT FOR VIOLATION OF SIXTH AMENDMENT TO THE UNITED STATES CONSTITUTION AND SPEEDY TRIAL ACT** |
| v. | |
| JEFFREY OLSEN, | |
| Defendant. | |

# I.

*I consider the trial by jury as the only anchor, ever yet imagined by man, by which a government can be held to the principles of its constitution.*

–Thomas Jefferson[1]

The United States Constitution protects our fundamental freedoms and liberties. One of the most important rights guaranteed by the Constitution is the Sixth Amendment right of the accused to a public and speedy trial. It protects against undue and oppressive incarceration prior to trial and it allows the accused the ability to defend himself against the criminal charges before evidence becomes lost or destroyed and witnesses' memories fade. But the Sixth Amendment protects much more than just the rights of the accused. It also protects the rights of all of us. It gives each of us called for jury service a voice in our justice system. And it holds the government accountable to the principles of the Constitution. Thomas Jefferson and the other Framers of the Constitution wisely recognized that without jury trials, power is abused and liberty gives way to tyranny.

Given the constitutional importance of a jury trial to our democracy, a court cannot deny an accused his right to a jury trial unless conducting one would be impossible. This is true whether the United States is suffering through a national disaster, a terrorist attack, civil unrest, or the coronavirus pandemic that the country and the world are currently facing. Nowhere in the Constitution is there an exception for times of emergency or crisis. There are no ifs or buts about it.

Sadly, the United States District Court for the Central District of California has denied Defendant Jeffery Olsen his Sixth Amendment right to a public and speedy trial

---

[1] *From Thomas Jefferson to Thomas Paine,* National Archives (July 11, 1789), *available at* https://founders.archives.gov/documents/Jefferson/01-15-02-0259.

on the criminal charges that were filed against him in this case.  Specifically, the Chief Judge for the Central District refused to summon the jurors necessary to conduct Mr. Olsen's trial that was scheduled for October 13th of this year, believing it was too unsafe to conduct the trial during the coronavirus pandemic even if significant safety precautions were in place.  Most troubling, the Chief Judge refused to summon jurors for Mr. Olsen's trial even though grand juries have been convening for months in the same federal courthouse in Orange County where his trial would take place and state courts just across the street from that federal courthouse are conducting criminal jury trials.  Clearly, conducting a jury trial during this coronavirus pandemic is possible.  Yet the Central District prevented the Court from even trying to do so for Mr. Olsen.  Because the Central District denied Mr. Olsen a public and speedy trial under the Sixth Amendment, this Court now must dismiss the indictment against him.

## II.

Defendant Jeffrey Olsen, a physician, was indicted in 2017 with numerous counts of prescribing and distributing substances including oxycodone, amphetamine salts, alprazolam, and hydrocodone without a legitimate medical purpose.  (Dkt. 1.)  Trial was initially set for September 5, 2017.  (Dkt. 10.)  The Court has since approved several stipulations between the parties to continue this trial date.  (*See* Dkts. 19, 21, 23, 26, 35, 42, 44.)  The most recent was approved on June 19, 2020, and continued the trial date to October 13, 2020.  (Dkt. 46.)  Factoring in the time found excludable in these orders, and assuming no further time is excludable under the Speedy Trial Act, Mr. Olsen's trial must begin on or before October 27, 2020, or his constitutional right to a public and speedy trial will be violated.

On August 6, 2020, Chief Judge Philip S. Gutierrez issued a General Order suspending jury trials indefinitely in the Central District of California.  C.D. Cal. General

Order No. 20-09, In Re: Coronavirus Public Emergency, Order Concerning Phased Reopening of the Court (Aug. 6, 2020) ("Until further notice, no jury trials will be conducted in criminal cases.").  Indeed, no jury has been empaneled in the Central District in nearly 7 months.  *See* C.D. Cal. General Order No. 20-08, In Re: Coronavirus Public Emergency, Order Concerning Phased Reopening of the Court (May 28, 2020) (explaining that the Court would reopen in three phases, with Phase 3—resumption of jury trials—being "implemented at a date to be determined").  The General Order stated that to determine when the Central District will resume jury trials, it will use "gating criteria" from the Administrative Office of the United States Courts[2] "designed to determine local COVID-19 exposure risks based on 14-day trends of facility exposure, community spread, and community restrictions."  *Id.* ¶ 2.

Several weeks later, at an August 20, 2020 status conference in this case, Mr. Olsen's counsel stated that Mr. Olsen wished to go forward with his trial on October 13, 2020, and that he was unwilling to agree to the exclusion of any further time under the Speedy Trial Act.  (Dkt. 52 at 3.)  The government sought to continue the trial, arguing that the ends of justice would be served by a continuance, especially given the General Order indefinitely suspending jury trials.  (*See id.* at 4–6; Dkt. 54.)  The Court denied the government's application, concluding that the Constitution and Mr. Olsen's rights under the Speedy Trial Act require that Mr. Olsen's trial go forward on the scheduled date. (Dkt. 67.)  Consequently, the Court requested that the Chief Judge direct the jury department to summon jurors for Mr. Olsen's October 13, 2020 trial.  (*Id.* at 11.)  Relying on the General Order, however, the Chief Judge refused to do so.  (Dkt. 68.)  The Chief Judge determined that the "continued suspension of jury trials is necessary to protect the

---

[2] Administrative Office of the U.S. Courts, *Federal Judiciary COVID-19 Recovery Guidelines* (Apr. 24, 2020), *available at* https://www.fedbar.org/wp-content/uploads/2020/04/Federal-Judiciary-COVID-19-Recovery-Guidelines.pdf.

health and safety of prospective jurors, defendants, attorneys, and court personnel due to the Coronavirus Disease 2019 pandemic." (*Id.* at 1.)

Almost a month later, the Chief Judge, with "a unanimous vote of the Executive Committee, and without objection from the District Judges of the Court," reopened the Orange County federal courthouse where Dr. Olsen seeks to be tried for criminal hearings and emergency civil hearings, but not for jury trials. C.D. Cal. General Order No. 20-12, In Re Coronavirus Public Emergency, Order Concerning Reopening of the Southern Division (Sept. 14, 2020). The Chief Judge decided this limited reopening was appropriate because "per the gating criteria, local COVID-19 exposure risks in the Court's Southern Division are decreasing." *Id.* at 2.

More recently, in September of this year, the Chief Judge indicated in an interview with a reporter for the Daily Journal that jurors may soon be summoned for trials in the Orange County federal courthouse. (Dkt. 95-1 [September 23, 2020 Daily Journal Article, hereinafter "Article"].) Specifically, the Chief Judge stated that "decisions on resuming operations are being made in light of state government orders." (*Id.* at 1.) Those orders include California Governor Gavin Newsom's four-tier, color-coded system.[3] That system does not apply to the state judiciary, nor does it restrict essential businesses—in sectors including healthcare, emergency services, food, energy, transportation, and communications—from operating. Indeed, employees in those sectors have been displaying extraordinary courage and dedication by going to work every day during the pandemic, knowing the risks, while protecting themselves and others as best they can. They refuse to let the coronavirus prevent them from providing vital services and supplying essential goods to the public.

---

[3] Blueprint for a Safer Economy, *available at* https://covid19.ca.gov/safer-economy/.

The Governor's tier system applies only to non-essential businesses.  It outlines when and how those non-essential businesses may operate during the pandemic.  Under the system, each California county is ranked in one of four tiers "based on its test positivity and adjusted case rate."  In tier 1, also known as purple or widespread, many non-essential indoor businesses are closed.  In tier 2, also known as red or substantial, some non-essential indoor businesses are closed.  In tier 3, also known as orange or moderate, some indoor businesses are open with modifications.  In tier 4, also known as yellow or minimal, most indoor businesses are open with modifications.  Orange County is currently in tier 2.  The Chief Judge stated that the Central District will start summoning jurors in Orange County once it reaches tier 3.  (Article at 1.)  He further explained that jury trials will begin approximately 7 weeks later because "that's how long it takes to summon jurors."  (*Id.*)

In light of the Chief Judge's refusal to summon jurors for Mr. Olsen's trial and the 7-week turnaround time, Mr. Olsen filed a motion to dismiss the charges against him for violation of his speedy trial rights.  (Dkt. 85.)  On October 13, 2020, the Court held a hearing and heard argument on Mr. Olsen's motion.

## III.

The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury."  U.S. Const. amend. VI.  The right to a speedy trial "has roots at the very foundation of our English law heritage" and "is one of the most basic rights preserved by our Constitution."  *Klopfer v. State of N.C.*, 386 U.S. 213, 224, 226 (1967).  Indeed, "[e]xcept for the right of a fair trial before an impartial jury, no mandate of our jurisprudence is more important" than a defendant's right to a speedy trial.  *Furlow v. United States*, 644 F.2d 764, 769 (9th Cir. 1981).  The Sixth Amendment protects defendants by minimizing oppressive

pretrial incarceration and ensuring evidence needed to prove the defense remains available at the time of trial.  *See Klopfer*, 386 U.S. at 222; *id.* at 226–27 (Harlan, J., concurring); *United States v. Loud Hawk*, 474 U.S. 302, 312 (1986).  It also protects the public, giving the people a voice, ensuring the government has the evidence needed to prosecute, and holding leaders accountable to the Constitution.  *See Barker v. Wingo*, 407 U.S. 514, 519 (1972) ("In addition to the general concern that all accused persons be treated according to decent and fair procedures, there is a societal interest in providing a speedy trial which exists separate from, and at times in opposition to, the interests of the accused."); *United States v. Lloyd*, 125 F.3d 1263, 1268 (9th Cir. 1997) ("[T]the right to a speedy trial belongs not only to the defendant, but to society as well.").

Congress enacted the Speedy Trial Act in 1974 in order to make effective the Sixth Amendment's guarantee of a speedy trial.  Pub. L. No. 93-619; *see Furlow*, 644 F.2d at 798–69 (describing the Speedy Trial Act as the Sixth Amendment's "implementation").  The Act requires that a defendant's trial begin within 70 days of the filing of the indictment or the defendant's initial court appearance, whichever is later.  18 U.S.C. § 3161(c)(1).  "The Act recognizes, however, that legitimate needs of the government and of a criminal defendant may cause permissible delays."  *United States v. Daychild*, 357 F.3d 1082, 1090 (9th Cir. 2004).  Accordingly, it provides that certain periods of time may be excluded from the 70-day deadline.  For example, a court may exclude periods of delay resulting from competency examinations, interlocutory appeals, pretrial motions, the unavailability of essential witnesses, and delays to which the defendant agrees.  18 U.S.C. § 3162(h)(1)–(6).  The Act also contains a sort of catchall category of excludable time.  This section allows exclusion of time where a judge finds "that the ends of justice served by taking such action outweigh the best interest of the public and the defendant in a speedy trial."  18 U.S.C. § 3162(h)(7)(A).

Congress intended the "ends of justice" provision to be "rarely used." *United States v. Nance*, 666 F.2d 353, 355 (9th Cir. 1982) (quoting the Act's legislative history). To ensure that broad discretion does not undermine the Act's important purpose, Congress enumerated factors that courts must consider in determining whether to grant an "ends of justice" continuance. *Id.*; *see United States v. Clymer*, 25 F.3d 824, 829 (9th Cir. 1994) (explaining that "the 'ends of justice' exclusion . . . may not be invoked in such a way as to circumvent the time limitations set forth in the Act"). Those factors include, as relevant here, "[w]hether the failure to grant such a continuance in the proceeding would be likely to make a continuation of such proceeding impossible, or result in a miscarriage of justice." 18 U.S.C. § 3161(h)(7)(B)(i).

Continuances under the "ends of justice" exception in the Speedy Trial Act are appropriate if without a continuance, holding the trial would be *impossible*. 18 U.S.C. § 3161(h)(7)(B)(i). This exception has been used in response to natural disasters and other exigencies, but only where the triggering exigency made the criminal jury trial a physical and logistical impossibility. For example, the Ninth Circuit upheld a district court's order finding 14 days excludable where Mount Saint Helens erupted 2 days before the scheduled trial date. *Furlow*, 644 F.2d at 767–69. The court began its discussion by noting that "[a] close reading of the Speedy Trial Act . . . reveals no reference to the interruptions of nature." *Id.* However, the court explained that the eruption created a "cloud of volcanic dust," and was an incident "of worldwide significance" and "earth-shaking effect" that inflicted a "paralyzing impact on surrounding geographies, including the location of the court where the [defendant] was scheduled for trial." *Id.* at 767. The eruption "obviously interrupted transportation [and] communication," and "affect[ed] the abilities of jurors, witnesses, counsel, [and] officials to attend the trial." *Id.* at 767–68. Given that the physical circumstances precluded holding a jury trial, and "[t]he district court preserved the procedural safeguards and

specified a trial date rather than a *sine die* continuance," the court held that the 14-day continuance did not result in a speedy-trial violation.  *Id.* at 769.

Similarly, a New York district court applied the ends of justice exception to exclude a 20-day period after the September 11, 2001 terrorist attacks.  *United States v. Correa*, 182 F. Supp. 2d 326, 327 (S.D.N.Y. 2001).  In that case, the pretrial conference had been set for September 11, 2001, less than half a mile from the World Trade Center. *Id.*  However, after the attacks, the courthouse was evacuated and the jail where the defendant was detained was locked down for security reasons.  *Id.*  The courthouse, United States Attorney's office, and jail were "closed to all non-emergency personnel for nearly a week."  *Id.*  Even when they reopened, telephone, fax, and internet access were disrupted at all three locations.  *Id.*  Lawyers without access to their offices were less able to communicate effectively with the court and other counsel.  *Id.*  Law enforcement agents, including those working on that specific case, were "massively redeployed to emergency service work and the pressing needs of the terrorist attack."  *Id.*  "Security concerns and staffing difficulties at the [jail], which ha[d] also suffered dislocation of critical electronic and communications systems, [made] it virtually impossible, and clearly imprudent, to transport prisoners to [c]ourt."  *Id.*  Given that these numerous complications made holding a jury trial actually impossible, the court concluded that the ends of justice would be served by excluding the 20-day period after the attacks.[4]

There is no question that the current pandemic is serious, and with little precedent. But under the current circumstances, it is simply not a physical or logistical impossibility to conduct a jury trial.  Unlike in the cases where the ends of justice exception has been

---

[4] Other cases confirm that *actual impossibility* is key to applying the ends of justice exception.  *See United States v. Richman*, 600 F.2d 286, 294 (1st Cir. 1979) (finding no Speedy Trial Act violation where trial was continued three weeks after the "paralyzing . . . Blizzard of '78" that made it so that "[t]rial could not commence on" the scheduled date); *United States v. Scott*, 245 Fed. Appx. 391 (5th Cir. 2007) (concluding without substantial analysis that there was no Speedy Trial Act violation where some delay was attributable to Hurricane Katrina).

applied in the wake of a natural disaster or other exigency, travel and communication are functioning.  *See Furlow*, 644 F.2d at 767–69; *Correa*, 182 F. Supp. 2d at 327.  Although some aspects of the practice of law may be less convenient during this time when many are practicing social distancing, no one contends that it is not possible to perform necessary trial preparations or to attend the trial.  Nor does anyone argue that there is insufficient courthouse staff available to facilitate a trial.[5]  *See Furlow*, 644 F.2d at 767–69; *Correa*, 182 F. Supp. 2d at 327.

Indeed, if one had any doubt about the possibility of conducting a jury trial during the pandemic, one need look no further than the very courthouse in which Mr. Olsen seeks to have his jury trial in Orange County.  There, between June 24 and September 30, 2020, a grand jury convened and returned 41 indictments.[6]  (*See* Ex. 1, attached to this order.)  That means that the grand jury, which has at least 16 people on it, gathered in person in the Orange County federal courthouse numerous times.  While they were gathered, they heard testimony from witnesses and deliberated together.  If a grand jury can perform these functions in the exact courthouse where Mr. Olsen seeks to be tried, the Court surely can hold a jury trial for Mr. Olsen in that courthouse.[7]

Even more compelling is the fact that the state court across the street from the Orange County federal courthouse resumed jury trials with appropriate precautionary measures *nearly four months ago*.  The Orange County Superior Court did not hold any criminal jury trials in April or May of this year because of the pandemic.  However, from

---

[5] Indeed, Defendant notes that his status on bond means that even less courthouse staff will be required to facilitate his trial than would be needed to hold a trial for a defendant in custody.  (Dkt. 66 at 6.)

[6] The Santa Ana Grand Jury did not meet between March 5 and June 23, 2020.

[7] This also shows that the government continues to charge people with crimes and seek detention pending trial during the coronavirus pandemic.

June to September, it held 82 criminal jury trials and 4 civil jury trials.  (*See* Ex. 2, attached to this order.[8])  Notably, in June, July, and September, over 60% of potential Orange County jurors reported to fulfill their civic duty.  (*Id.*)  Obviously, the state court has accomplished this by taking numerous careful measures to ensure safety.  It accommodates social distancing by staggering times for juror reporting, trial start, breaks, and concluding for the day, seating jurors during trial in both the jury box and the audience area, marking audience seats, and using dark courtrooms as deliberation rooms. It also regularly disinfects the jury assembly room and restrooms, provides facial coverings, uses plexiglass shields in courtrooms, and requires trial participants to use gloves to handle exhibits.  (Dkt. 67, Ex. 2 at 1–10, 13–25, 34.)  Of course, similar safety precautions could have been in place for Mr. Olsen's trial, had the Central District allowed this Court to hold one.[9]

The government continues to cite the Chief Judge's General Order to support its position that the ends of justice exception should be applied to exclude further time under the Speedy Trial Act.  (*See* Dkt. 92 at 8–9; Dkt. 54 at 10–11.)  The government's continued reliance on the General Order is misplaced.  The General Order—adopted after a majority vote of judges in this district—does not say that it is impossible to conduct a jury trial.  Rather, it, like the government in this case, relies on the premise that the pandemic has rendered it *unsafe* to conduct a jury trial at this time.  The General Order and the government note that people continue to be infected, hospitalized, and— tragically—die due to the virus, and that holding jury trials will likely put people at increased risk of contracting the virus.  C.D. Cal. General Order No. 20-09 ¶ 6.a.  The Court, of course, acknowledges the public health risk the virus poses to people.  But the

---

[8] These statistics were supplied to the Court by the Assistant Presiding Judge of the Orange County Superior Court, Erick L. Larsh.

[9] Also worth noting is that the Southern District of California and other federal courts throughout the country are holding jury trials.

Constitution does not turn on this consideration.  Instead, to protect the fundamental right to a speedy trial guaranteed by the Sixth Amendment, the Constitution requires that a trial only be continued over a defendant's objection if holding the trial is *impossible*.  Holding Mr. Olsen's trial at this time is plainly not impossible.

Particularly troubling about the General Order's suspension of jury trials is that it is indefinite.  The Order states that the Central District will determine when to resume jury trials using "gating criteria [that] is designed to determine local COVID-19 exposure risks based on 14-day trends of facility exposure, community spread, and community restrictions."  C.D. Cal. General Order 20-09 ¶ 2.  However, the Ninth Circuit has repeatedly admonished that "an ends of justice exclusion must be 'specifically limited in time.'"  *United States v. Ramirez-Cortez*, 213 F.3d 1149, 1154 (9th Cir. 2000) (quoting *Lloyd*, 125 F.3d at 1268 (quoting *United States v. Jordan*, 915 F.2d 563, 565 (9th Cir. 1990)));  *see Furlow*, 644 F.2d at 769 (noting that a *sine die* continuance would be unacceptable).  In keeping with this requirement, the periods of time courts excluded under the Speedy Trial Act due to previous natural disasters and other exigencies were brief and definite.  *See Furlow*, 644 F.2d at 768 (14 days); *Correa*, 182 F. Supp. 2d at 329 (20 days); *Richman*, 600 F.2d at 294 (3 weeks).  The gating criteria—which is completely untethered to the constitutional implications of a criminal defendant's right to a speedy trial—does not make sufficiently certain what is otherwise an unacceptably uncertain end date.

What is more, an "ends of justice" exclusion must be justified with reference to specific factual circumstances in the particular case as of the time the delay is ordered.  *Ramirez-Cortez*, 213 F.3d at 1154 (concluding that an ends of justice continuance was not sufficiently justified where the judge made no inquiry into the actual need for a continuance in the particular case, instead checking off boxes on pre-printed forms without making findings on statutory factors, and the record showed that the judge "was

-12-

granting blanket continuances").  By its very nature, the General Order does not justify delays as of the time they are ordered in any particular case.  And the government offered no reason why an "ends of justice" exclusion of time was justified in this specific case.  For instance, it made no mention of an essential witness being unavailable or an attorney on the case suffering a unique hardship.  *See United States v. Pollock*, 726 F.2d 1456, 1461 (9th Cir. 1984) (stating that the "ends of justice" exclusion "was to be based on specific underlying factual circumstances" and "cannot be invoked without specific findings in the record").[10]

Nor does the Governor's color-coded tier system fix the constitutional problems with the General Order.  Apparently, the Chief Judge is now relying on that system to determine when jury trials will resume.  That system is for non-essential businesses.  It does not apply to state courts, let alone federal courts.  It is of no consequence to the constitutional analysis here.  The right to a public and speedy trial is guaranteed by the Constitution.  *It is and always will be essential.*

Not surprisingly, the Central District's suspension of jury trials has taken its toll on the fair administration of justice in the district.  Because of the growing backlog in trials and the delay of many sentencings during the pandemic, jails have become increasingly crowded.  The problem has gotten so bad that people charged with crimes in California, and whose families and lawyers are in California, are being transported without notice to Arizona because there is simply no longer bed space in the Central District to house

---

[10] It should be noted for the record that in July of this year, this Court agreed with all the other judges in the Central District not to conduct jury trials in August.  At that time, this Court had no case on its docket in which a defendant was unwilling to exclude time under the Speedy Trial Act because of the coronavirus pandemic.  It therefore made no sense to the Court to burden prospective jurors by summoning them to the courthouse when their service was not needed.  Circumstances, however, have now changed.  Mr. Olsen is unwilling to agree to the exclusion of any further time under the Speedy Trial Act.

them.[11]  *See, e.g.*, *United States v. Joshua Jenkins*, Case No. 2:20-cr-00068-CJC-1, Dkt. 41 (September 2, 2020 Order Granting Defendant's Ex Parte Application for Immediate Transfer from the San Luis Detention Center in Arizona to the Metropolitan Detention Center in California).  These moves interfere with defendants' ability to confer with their counsel and to prepare for trial, impeding not only the defendants' right to a speedy trial, but also their right to effective assistance of counsel.  *See, e.g.*, *id.*, Dkt. 36 (Ex Parte Application for Transfer, explaining that "Mr. Jenkins has now been removed from geographic proximity to defense counsel, potential witnesses, and family and friends who can facilitate communication with potential witnesses").

Even more disturbing is the fact that the government is now offering favorable deals to defendants to incentivize them to plead guilty.  Reports from the Central District United States Attorney's Office show that the office has nearly three times the number of cases in the pre-trial phase and only about half the cases in the pre-sentencing phase in 2020 as compared to a similar period in 2019.  Consequently, it has authorized AUSAs to offer two-level variances under the Sentencing Guidelines to many defendants so long as they waive their right to in-person hearings, sign plea agreements quickly (before October 16, 2020), and enter their plea at the first date ordered by the court.  *See, e.g.*, *United States v. Manuel Ignacio Ruiz*, Case No. 5:20-cr-00019-CJC-6, Dkt. 540 (September 17, 2020 Plea Agreement where the defendant consented to video hearings under the CARES Act, and the government agreed to recommend a two-level reduction in the applicable Sentencing Guidelines offense level, a term of imprisonment no higher than the low end of the applicable guideline range, and that the defendant not be required to self-surrender until after February 1, 2021)  In other words, the government is now offering very favorable plea deals based not on the defendant's individual circumstances,

---

[11] Chief Judge Gutierrez has stated that the "real driver behind a massive case backlog" is the Central District's "shortage of judges – not the court's suspended operations."  (Article at 1.)  But confirming new judges will not alleviate the backlog in jury trials, nor alleviate the problems occurring because of a lack of bed space.  Only holding jury trials will do that.

but rather based on exigencies manufactured by the Central District's refusal to resume jury trials.

Quite frankly, the Court is at a loss to understand how the Central District continues to refuse to resume jury trials in the Orange County federal courthouse.  The Internal Revenue Service, the Social Security Administration, and other federal agencies in Orange County are open and their employees are showing up for work.  Police, firefighters, and other first responders in Orange County are all showing up for work.  Hospitals and medical offices in Orange County are open to patients and the medical professionals are showing up for work.  Grocery stores, hardware stores, and all essential businesses in Orange County are open and their employees are showing up for work.  State courts in Orange County are open and holding jury trials.  Orange County restaurants are open for outdoor dining and reduced-capacity indoor dining.  Nail salons, hair salons, body waxing studios, massage therapy studios, tattoo parlors, and pet groomers in Orange County are open, even indoors, with protective modifications.  Children in Orange County are returning to indoor classes at schools, with modifications.  Even movie theaters, aquariums, yoga studios, and gyms in Orange County are open indoors with reduced capacity.  Yet the federal courthouse in Orange County somehow remains closed for jury trials.  The Central District's refusal to resume jury trials in Orange County is indefensible.

In the Court's view, it is not a question of *if* the Court should have held Mr. Olsen's criminal jury trial during this stage of the coronavirus pandemic, but a question of *how* the Court should have held it.  If it is not impossible to hold grand juries in the courthouse where Mr. Olsen's trial will take place, and it is not impossible to hold criminal jury trials in the state court across the street from that courthouse, it was clearly not impossible to hold a criminal jury trial for Mr. Olsen.  Mr. Olsen's right to a speedy trial is one of the most basic and important rights preserved by our Constitution.  *Klopfer*,

386 U.S. at 224; *Furlow*, 644 F.2d at 769.  The Central District never should have denied him his right to one.

## IV.

In light of the Central District's violation of Mr. Olsen's constitutional right to a public and speedy trial, the question then becomes what the remedy should be for the Central District's violation.  The law is clear on this issue.  When a defendant is not brought to trial within the 70-day time limit (minus all properly excludable periods of delay) and brings a motion to dismiss, the court *must* dismiss the indictment.  18 U.S.C. § 3162(a)(2); *see United States v. Medina*, 524 F.3d 974, 980 (9th Cir. 2008).  The strictness of this remedy highlights the importance of the rights it protects.  *See Lloyd*, 125 F.3d at 1268 ("Congress designed the Speedy Trial Act in part to protect the public's interest in the speedy administration of justice, and it imposed the sanction of dismissal under § 3162 to compel courts and prosecutors to work in furtherance of that goal.").  The Court therefore has no choice but to dismiss the indictment against Mr. Olsen.

The only question remaining is whether to dismiss the indictment with or without prejudice.  "In determining whether to dismiss the case with or without prejudice, the court shall consider, among others, each of the following factors: [1] the seriousness of the offense; [2] the facts and circumstances of the case which led to the dismissal; and [3] the impact of a reprosecution on the administration of this chapter and on the administration of justice."  18 U.S.C. § 3162(a)(2).[12]  A court's decision of whether to

---

[12] Both parties urge the Court to perform a separate analysis to determine whether Mr. Olsen's Sixth Amendment right was violated (as opposed to his rights under the Speedy Trial Act).  Both cite *Barker v. Wingo*, a case decided before the Speedy Trial Act was enacted, which explains that courts should balance the "[l]ength of delay, the reason for the delay, the defendant's assertion of his right, and prejudice to the defendant."  *Barker*, 407 U.S. at 530; *see Doggett v. United States*, 505 U.S. 647, 651 (1992).  The analysis of these factors parallels the analysis the Court now makes, and the Court does not repeat itself to analyze that test separately.

dismiss the charges with or without prejudice depends on a "careful application" of these factors to the particular case. *Clymer*, 25 F.3d at 831.

Admittedly, the first factor—the seriousness of the offense—weighs in favor of a dismissal without prejudice. There is no doubt that the crimes of which Mr. Olsen is accused—prescribing dangerous combinations and unnecessary amounts of highly regulated pain medications—are extremely serious. *See Medina*, 524 F.3d at 986–87 (explaining that serious crimes weigh in favor of dismissal without prejudice); *Clymer*, 25 F.3d at 831 (describing crimes of conspiracy to distribute and aiding and abetting the manufacture of methamphetamine as "undoubtedly serious"). Indeed, the government contends that Mr. Olsen knew that two of his patients died from overdose on the same pain medications he had previously prescribed, yet continued to prescribe dangerous combinations and unnecessary amounts of pain medication to his patients. (*See* Dkt. 94 [Order denying Mr. Olsen's motion in limine to exclude evidence of uncharged patient deaths].) However, this factor does not outweigh the other two factors the Court must consider. *See, e.g.*, *Clymer*, 25 F.3d at 831 (affirming dismissal with prejudice of conspiracy to distribute methamphetamine); *United States v. Ramirez*, 973 F.2d 36, 37 (1st Cir. 1992) (affirming dismissal with prejudice charges of possession of over 500 grams of cocaine with the intent to distribute, and conspiracy to distribute).

Most important in this case are the facts and circumstances leading to dismissal. The Chief Judge of the Central District—supported by a majority vote of judges in the district—decided not to summon jurors for Mr. Olsen's trial. He made that decision knowing that holding a jury trial in Orange County was possible. He made that decision knowing that a grand jury was convening in the Orange County federal courthouse. He made that decision knowing that Orange County state courts were open for jury trials. And he made that decision knowing that Orange County non-essential businesses were open with appropriate modifications for safety. His decision was knowingly and

willfully made.  The primary factor driving the Chief Judge's decision was the risk that people might get sick from the coronavirus.  (*See* Dkt. 68 at 1.)  But his decision was made with little or no regard for Mr. Olsen's constitutional right to a public and speedy trial.  Indeed, in his order denying the Court's request to summon jurors for Mr. Olsen's trial, the Chief Judge made no mention of the Constitution at all.

The Central District's constitutional violation here also was not a mere technical one.  *See Medina*, 524 F.3d at 987 (affirming dismissal without prejudice where district court found the violations of the Speedy Trial Act were "technical, rather than substantive").  Nor was it isolated and unwitting.  *See United States v. Taylor*, 487 U.S. 326, 342 (1988) (indicating that dismissal with prejudice is appropriate where there is "something more than an isolated unwitting violation"); *Medina*, 524 at 987 (explaining that a "culture of poor compliance" with the Speedy Trial Act would weigh in favor of dismissing with prejudice); *United States v. Ramirez*, 973 F.2d 36, 39 (1st Cir. 1992) ("The expansiveness of such a STA violation risk makes it important for a court to correct for the sake of deterrence and more painstaking vigilance.").  Rather, it was a substantive policy decision to suspend the constitutional rights of Mr. Olsen and every other defendant unwilling to waive time.  *See Taylor*, 487 U.S. at 339 (finding that even "a truly neglectful attitude" toward the Speedy Trial Act could weigh in favor of dismissing with prejudice); *Medina*, 524 F.3d at 987; *Ramirez*, 973 F.2d at 39 (explaining that violations "caused by the court or the prosecutor" weigh in favor of granting a dismissal with prejudice).

Finally, barring reprosecution in this case by dismissing with prejudice is the only sanction with enough teeth to create any hope of deterring additional delay in the resumption of jury trials and avoiding further dismissals of indictments for violations of defendants' constitutional rights to a public and speedy trial.  *See Taylor*, 487 U.S. at 342 ("It is self-evident that dismissal with prejudice always sends a stronger message than

dismissal without prejudice, and is more likely to induce salutary changes in procedures, reducing pretrial delays.").  A dismissal without prejudice, on the other hand, allows the government simply to go before the grand jury, obtain a new indictment, and proceed as if no constitutional violation ever occurred.  *See* 18 U.S.C. § 3288 (permitting the government to obtain a new indictment within six calendar months of the date of the dismissal, "which new indictment shall not be barred by any statute of limitations"); *United States v. Bert*, 814 F.3d 70, 86 (2d Cir. 2016) ("The fact that the government must reindict the defendant is not a particularly strong deterrent.").  In effect, there would be no adverse consequences from the Central District's knowing and willful decision to violate Mr. Olsen's constitutional right to a public and speedy trial.  Such a meaningless result would "send exactly the wrong signal" and foster in the future "a cavalier regard, if not a concerted disregard" of the Constitution.  *Ramirez*, 973 F.2d at 39; *see Bert*, 814 F.3d at 86 (encouraging courts to consider "the likelihood of repeated violations and whether there are potential administrative changes prompted by this violation").[13]  This Court will not let that happen.

## V.

*"The wisdom of our ages and the blood of our heroes has been devoted to the attainment of trial by jury.  It should be the creed of our political faith."*

–Thomas Jefferson[14]

---

[13] That the district judges and the government did not act with malice does not change this analysis.  *See Ramirez*, 973 F.2d at 39 ("Even though the oversight was accomplished without malice, that does not ameliorate the gravity of its effects."); *Bert*, 814 F.3d at 80 (affirming that "a finding of 'bad faith' is not a prerequisite to dismissal with prejudice").

[14] *First Inaugural Address,* National Archives (March 4, 1801), *available at* https://founders.archives.gov/documents/Jefferson/01-33-02-0116-0004.

1    The Central District denied Mr. Olsen his constitutional right to a public and

2  speedy trial.  It did so not because it was impossible to conduct the jury trial as is

3  required by the Sixth Amendment.  It did so because it was fearful people would get sick

4  from the coronavirus.  But no emergency or crisis, not even the coronavirus pandemic,

5  should suspend the Sixth Amendment or any of our constitutional rights.  The

6  Constitution guarantees these rights to us during all times, good or bad.  Because Mr.

7  Olsen was denied his Sixth Amendment right to a public and speedy trial, this Court now

8  must dismiss the charges against him, and that dismissal must be with prejudice.  The

9  Court's order dismissing the charges with prejudice will not take effect until October 28,

10  2020, when the time limit for commencing Mr. Olsen's trial will have expired.[15]

11

12    DATED:    October 14, 2020

13

14                                    CORMAC J. CARNEY

15                                    UNITED STATES DISTRICT JUDGE

16

17

18

19

20

21

22

23

24

25

---

26  [15] Mr. Olsen raised in reply the possibility that time while Mr. Olsen's motion is pending "could be
considered excludable time under 18 U.S.C. 3161(h)(1)(D), which makes excludable "delay resulting

27  from any pretrial motion, from the filing of the motion through the conclusion of the hearing on, or other
prompt disposition of, such motion."  (Dkt. 95 at 2 n.1.)  But that section excludes only pretrial delay

28  "*resulting from*" a pending motion, not all pretrial delay that merely coincides with the pendency of a
motion.  *Clymer*, 25 F.3d at 830.  No delay in the trial resulted during the time this motion was pending.

-20-

# EXHIBIT 1

| | | | | |
|---|---|---|---|---|
| **INDICTMENTS RETURNED IN SOUTHERN DIVISION** <br> **June 24, 2020 through September 30, 2020** | | | | |
| | Date Indictment Filed | Case Number | Case Name | Notes |
| 1 | June 24, 2020 | 8:20-cr-00077-JLS | USA v. Martinez, et al. | |
| 2 | | 8:20-cr-00078-DOC | USA v. Jorgo | |
| 3 | | 8:20-cr-00079-JVS | USA v. Staples | |
| 4 | | 8:20-cr-00002(A)-DOC | USA v. Le, et al. | 1st Superseding Indictment |
| 5 | REDACTED | REDACTED | REDACTED | Filed Under Seal |
| 6 | REDACTED | REDACTED | REDACTED | Filed Under Seal |
| 7 | | 5:20-cr-00123-JGB | USA v. Renteria | |
| 8 | | 5:20-cr-00124-JGGB | USA v. Gil-Carranza, et al. | |
| 9 | | 8:20-cr-00083-DOC | USA v. Do | |
| 10 | | 8:20-cr-00084-DOC | USA v. Tran, et al. | |
| 11 | July 22, 2020 | 8:20-cr-00091-JVS | USA v. Memije | |
| 12 | | 5:20-cr-00132-JGB | USA v. Moore, et al. | |
| 13 | | 8:20-cr-00090-JLS | USA v. Nunez | |
| 14 | | 8:20-cr-00089-JLS | USA v. Rangel | |
| 15 | | 2:19-cr-00756(A)-JAK | USA v. Ryan, et al. | 1st Superseding Indictment |
| 16 | REDACTED | REDACTED | REDACTED | Filed Under Seal |
| 17 | | 8:20-cr-00097-JLS | USA v. Villa | |
| 18 | | 5:20-cr-00138-PA | USA v. Garcia | |
| 19 | | 8:19-cr-00208(A)-DOC | USA v. Pongsamart | 1st Superseding Indictment |
| 20 | | 8:20-cr-00098-JLS | USA v. Gonzalez | |
| 21 | Aug. 12, 2020 | 8:20-cr-00104-DOC | USA v. Flores | |
| 22 | | 8:20-cr-00105-JVS | USA v. Fernandez | |
| 23 | | 8:20-cr-00106-JVS | USA v. Spagnolini | |
| 24 | | 8:20-cr-00107-JLS | USA v. Kuhns | |
| 25 | | 8:20-cr-00108-JVS | USA v. Anderson | |
| 26 | REDACTED | REDACTED | REDACTED | Filed Under Seal |
| 27 | Sept. 16, 2020 | 8:20-cr-00133-AB | USA v. Lewis, et al. | |
| 28 | | 8:20-cr-00134-SVW | USA v. Ramirez | |
| 29 | | 8:20-cr-00135-ODW | USA v. Chacon | |
| 30 | | 8:20-cr-00136-SVW | USA v. Mitchell | |
| 31 | | 8:20-cr-00137-DSF | USA v. Van Dyke | |
| 32 | REDACTED | REDACTED | REDACTED | Filed Under Seal |
| 33 | REDACTED | REDACTED | REDACTED | Filed Under Seal |
| 34 | Sept. 30, 2020 | 8:20-cr-00140-VAP | USA v. Hicks | |
| 35 | | 8:20-cr-00141-JAK | USA v. Jeffries | |
| 36 | | 5:20-cr-00186-DMG | USA v. Jones | |
| 37 | | 5:20-cr-00187-PA | USA v. Lawhead | |
| 38 | | 8:20-cr-00142-SB | USA v. Wampler | |

| 39 | REDACTED | REDACTED | REDACTED | Filed Under Seal |
|----|----------|----------|----------|------------------|
| 40 | REDACTED | REDACTED | REDACTED | Filed Under Seal |
| 41 | REDACTED | REDACTED | REDACTED | Filed Under Seal |

# EXHIBIT 2

## Jury Trials Completed in Orange County Superior Court

**COURTWIDE JURY TRIALS**
June 2020 thru September 2020

| Month | CJC | | | | HJC | | | NJC | | | WJC | | | COURTWIDE | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Felony | Misd. | Civil | Total | Felony | Misd. | Total | Felony | Misd. | Total | Felony | Misd. | Total | Felony | Misd. | Civil | Total |
| June | 4 | 9 | 0 | 13 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 2 | 2 | 4 | 11 | 0 | 15 |
| July | 3 | 3 | 0 | 6 | 0 | 2 | 2 | 0 | 0 | 0 | 0 | 5 | 5 | 3 | 10 | 0 | 13 |
| August | 10 | 9 | 0 | 19 | 1 | 1 | 2 | 0 | 0 | 0 | 0 | 6 | 6 | 11 | 16 | 0 | 27 |
| September | 11 | 9 | 4 | 24 | 0 | 3 | 3 | 0 | 0 | 0 | 3 | 1 | 4 | 14 | 13 | 4 | 31 |

\* Count represents when a new jury trial is started, regardless if the jury trial is completed during the reporting month.

## Juror Reporting Statistics in Orange County Superior Court

| | Jurors Summoned | Jurors Asked to Report | Jurors Reported | % Reported |
|---|---|---|---|---|
| **April** (Court Closed) | 36,212 | 0 | 0 | **0%** |
| **May** (Court Closed) | 42,850 | 0 | 0 | **0%** |
| **June** | 40,378 | 3,057 | 1,943 | **64%** |
| **July** | 61,716 | 2,047 | 1,265 | **62%** |
| **August** | 54,008 | 4,381 | 1,971 | **45%** |
| **September** | 58,077 | 4,709 | 2,865 | **61%** |
| **Totals** | **293,241** | **14,194** | **8,044** | **57%** |